**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**

**CASE NO. 0:17-cv-61211**

ANTHONY STONE, JAMIRA HAWTHORNE,
MICHELLE KONDERS, NICK PHILISTINE,
GUERLINE SALOMON, ANA BATISTA,
DEMOND MINER, ERIC TOWNSEND,
JENNIFER DODGE, JOHNATHAN LAMBERT,
KEVIN RICE, LISA ROBINSON,
SABRINA HOLMES, MANFRED ZAEPERNICK
NANCY HOWELLS-GRANT, AND RAYMOND SMITH,

        PLAINTIFFS,

  v.

CITY OF FORT LAUDERDALE,

        DEFENDANT.

_____/

**PLAINTIFFS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF AND FOR DAMAGES AND DEMAND FOR JURY TRIAL**

**Preliminary Statement**

1.    Plaintiffs ANTHONY STONE, JAMIRA HAWTHORNE, MICHELLE KONDERS, NICK PHILISTINE, GUERLINE SALOMON, ANA BATISTA, DEMOND MINER, ERIC TOWNSEND, JENNIFER DODGE, JOHNATHAN LAMBERT, KEVIN RICE, LISA ROBINSON, SABRINA HOLMES, MANFRED ZAEPERNICK, NANCY HOWELLS-GRANT, AND RAYMOND SMITH bring this action involving a municipal policy and practice of confiscating and destroying the property of individuals who are homeless and live in the Defendant CITY OF FORT LAUDERDALE, FLORIDA (City).

2.      As alleged with more particularity below, the City intentionally and indiscriminately raided Plaintiffs' encampment and unlawfully seized and destroyed Plaintiffs' property.

3.      The City conducted the raid without notice and in a manner that prevented Plaintiffs from retrieving their personal property to avoid its destruction.

4.      The City arbitrarily decided to allow only individuals present at the time of the raid to save and store personal possessions they were able to retrieve within a few minutes. The City immediately and summarily destroyed all personal belongings that Plaintiffs were unable to retrieve during the very short allotted timeframe.

5.      For those who were not present at the time of the raid or who arrived while the raid was in progress, the City provided no means for Plaintiffs to claim or retrieve their personal possessions. Instead, the City immediately and summarily destroyed Plaintiffs' property.

6.      The City's unlawful actions deprived Plaintiffs of personal belongings that are critical to their survival, such as medications, clothing, blankets, and tents as well as irreplaceable personal possessions, such as family photographs and keepsakes.

7.      The intentional taking and destruction of Plaintiffs' personal property violates Plaintiffs' constitutional rights to be free from unreasonable seizure and to due process of law.

8.      Plaintiffs seek injunctive relief enjoining the City from taking and destroying Plaintiffs' personal property in violation of their constitutional rights. Plaintiffs also seek a declaratory judgment that the City's policies and practices are unlawful under the United States Constitution.

9.     Plaintiffs further seek damages resulting from the City's intentional destruction of their personal property, in violation of Plaintiffs' constitutional rights under the United States Constitution.

## Jurisdiction and Venue

10.    This action arises under the Fourth and Fourteenth Amendments to the United States Constitution. The Court has original jurisdiction over these claims pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343(a)(3) & (4). Plaintiffs' claims for declaratory and injunctive relief are authorized under 28 U.S.C. §§ 2201-02 and 42 U.S.C. § 1983.  At all times relevant to this action, Defendant acted under color of state law.

11.    Venue is proper in the Southern District of Florida, Fort Lauderdale Division, pursuant to 28 U.S.C. § 1391(b). All of the acts and omissions complained of herein occurred in the City of Fort Lauderdale, Broward County, Florida, which falls within the Fort Lauderdale Division of the Southern District of Florida.

## Parties

12.    Plaintiff Anthony Stone was a resident of Fort Lauderdale and homeless at all relevant times.

13.    Plaintiff Jamira Hawthorne was a resident of Fort Lauderdale and homeless at all relevant times.

14.    Plaintiff Michelle Konders was a resident of Fort Lauderdale and homeless at all relevant times.

15.    Plaintiff Nick Philistine was a resident of Fort Lauderdale and homeless at all relevant times.

16.     Plaintiff Guerline Salomon was a resident of Fort Lauderdale and homeless at all relevant times.

17.     Plaintiff Ana Batista was a resident of Fort Lauderdale and homeless at all relevant times.

18.     Plaintiff Demond Miner was a resident of Fort Lauderdale and homeless at all relevant times.

19.     Plaintiff Eric Townsend was a resident of Fort Lauderdale and homeless at all relevant times.

20.     Plaintiff Jennifer Dodge was a resident of Fort Lauderdale and homeless at all relevant times.

21.     Plaintiff Johnathan Lambert was a resident of Fort Lauderdale and homeless at all relevant times.

22.     Plaintiff Kevin Rice was a resident of Fort Lauderdale and homeless at all relevant times.

23.     Plaintiff Lisa Robinson was a resident of Fort Lauderdale and homeless at all relevant times.

24.     Plaintiff Sabrina Holmes was a resident of Fort Lauderdale and homeless at all relevant times.

25.     Plaintiff Manfred Zaepernick was a resident of Fort Lauderdale and homeless at all relevant times.

26.     Plaintiff Nancy Howells-Grant was a resident of Fort Lauderdale and homeless at all relevant times.

4

27.     Plaintiff Raymond Smith was a resident of Fort Lauderdale and homeless at all relevant times.

28.     Defendant City of Fort Lauderdale is a municipal corporation, duly organized and existing under the laws of the State of Florida, with the capacity to sue and be sued.

## Factual Allegations

29.     In May 2017, the City designed a plan to temporarily close Stranahan Park and to close the homeless encampment adjacent to Stranahan Park by seizing the personal property of homeless individuals who camp, sleep, or otherwise gather at or near Stranahan Park.

30.     Stranahan Park is a centrally located public park in downtown Fort Lauderdale.

31.     Stranahan Park has been a gathering place for homeless individuals in the City for many years.

32.     In May 2017, approximately forty homeless individuals were residing on the public areas surrounding the park.

33.     This homeless encampment was well known to City officials, including Mayor Jack Seiler and City Manager Lee Feldman, because it is highly visible in the downtown area.

34.     Homeless people who stayed on the sidewalks surrounding Stranahan Park had sleeping materials with them such as blankets, and personal belongings including clothes, shoes, personal hygiene products, medications, and important documents.

35.    On May 19, 2017, with no notice to the individuals residing near Stranahan Park, City workers and police officers arrived at Stranahan Park with front-end loaders, dumpsters, and blue bins.

36.    Homeless individuals who were present when the City arrived were only given a few minutes to put personal belongings into blue bins, which were seized and stored by the City. These individuals were not provided sufficient time to save all of their personal items by placing them into the blue bins. The City seized and summarily destroyed items that the homeless individuals were not able to place into the blue bins.

37.    Persons who were not at the encampment at the time of the City's action arrived to find all of their belongings were seized and summarily destroyed by the City.

**City's Actions at Stranahan Park**

38.    The City Commission held a "Commission Prioritization Session" on May 10, 2017 at the Fort Lauderdale Women's Club, adjacent to Stranahan Park.[1]

39.    Mayor Seiler stated that it was during that meeting that he and other City officials first noticed rodents at or around Stranahan Park.

40.    During the May 10 meeting, the Commissioners discussed the homeless population congregated around Stranahan Park.

41.    During the May 10 meeting, Mayor Seiler expressed his concerns about what he saw in Stranahan Park which he described as a "negative visual impact of so many homeless in downtown."

42.    Mayor Seiler commented that he would consider it a success if the City could move the homeless out of this highly visible location that impacts businesses.

---

[1] The audio from the May 10 "Commission Prioritization Session" is available at http://www.fortlauderdale.gov/Home/Components/News/News/1385/16?backlist=%2f.

43.     A City of Fort Lauderdale employee, Jeri Pryor, contacted the State of Florida Department of Health for Broward County on May 15, 2017 to report that there were a number of rats running around the exterior of the Broward County library between Stranahan Park at 10 East Broward Boulevard and the library.

44.     Pryor's report to the Department of Health was done with the knowledge and approval of City Manager Lee Feldman.

45.     Jeri Pryor is the Homelessness Intervention Administrator for the City of Fort Lauderdale.

46.     Broward County Health Department Inspector Natalie Zaher investigated the complaint initiated by Pryor on May 16, 2017.

47.     Pryor accompanied Inspector Zaher during the inspection of Pryor's complaint.

48.     Inspector Zaher did not find any evidence of the presence of rats at the Broward County library.

49.     Inspector Zaher found a group of homeless individuals camping in between Stranahan Park and the Broward County library.

50.     Inspector Zaher observed "tarps, boxes, trash bags, garbage and several other material accumulation creating harborage for rats."

51.     Inspector Zaher's written report does not state that she observed any rats during her investigative visit.

52.     On Tuesday, May 16, 2017 at 10:30 a.m. Inspector Zaher issued a "Notice of Violation" #47128 to the City of Fort Lauderdale finding that the City of Fort

Lauderdale committed a "Rodent" offense in violation of Florida Statute 386.01 and Broward County Code 14-67(b)(5).

53.     Florida Statute 386.01 is a "sanitary nuisance" which is defined as:

[T]he commission of any act, by an individual, municipality, organization, or corporation, or the keeping, maintaining, propagation, existence, or permission of anything, by an individual, municipality, organization, or corporation, by which the health or life of an individual, or the health or lives of individuals, may be threatened or impaired, or by which or through which, directly or indirectly, disease may be caused.

54.     Broward County Code 14-67(b)(5) reads as follows:

The existence, retention, maintenance, propagation, or creation of any one or more of the following conditions shall constitute prima facie evidence of the maintenance of a nuisance injurious to health…[t]he creation, maintenance or causing of any condition capable of breeding or attracting rats, mice, flies, mosquitoes, or other arthropods or animals capable of transmitting diseases either directly or indirectly to humans.

55.     The Broward County Health Code violation issued to the City stated that the violation must be corrected by 8 a.m. on or before June 16, 2017.

56.     On May 18, 2017, City Manager Lee Feldman informed the Mayor and City Commission that the City received a Notice of Violation from the Department of Health. He stated that he would be meeting with staff in the morning to determine how to address the issue. He also stated that the City's actions "at a minimum, will consist of evacuating the area" and anticipated the park would need to be closed for some time.

57.     Mayor Seiler wrote City Manager Feldman an email on May 18, 2017 directing Feldman to "take immediate action as you deem necessary." Mayor Seiler delegated authority to City Manager Feldman to take action to address the issue.

58.     On May 19, 2017 at 2:38 p.m., City Manager Feldman notified Mayor Seiler and the City Commission that the City was in the process of closing Stranahan Park and removing the individuals present.

59.     On May 19, 2017, City officials closed Stranahan Park and the adjacent sidewalks to the general public, and posted signs that read "No Trespassing Florida Department of Health in Broward has issued a Notice of Violation #47128 identifying a health violation in this area[.] All trespassers are subject to arrest and prosecution[.] City of Fort Lauderdale Code of Ordinances 16-26 & 16-1 Florida Statute 810.09 Property of City of Fort Lauderdale[.]"

60.     At the same time that the City closed Stranahan Park and the adjacent sidewalks on May 19, City employees arrived at Stranahan Park with a front-end loader, a dump truck, and blue bins.

61.     The City used the front-end loader to scoop up homeless persons' personal property from the sidewalk adjacent to Stranahan Park and dispose of these items into the dump truck.

62.     The City's policy for the encampment closure was that anything on the sidewalk was "trash" and would be removed and disposed of, unless there was someone present to claim his/her own personal belongings and that person was able to put those belongings into a blue bin within the time allowed.

63.     The residents of the Stranahan Park encampment usually would look after each other's personal belongings, ensuring that someone would remain to protect the other people's belongings. This allowed residents of the encampment to take care of basic needs such as taking showers, using the bathroom, going to work or school, and visiting friends or social service agencies.

64.     Even though the City knew that personal items in the encampment belonged to homeless individuals who were not present, the City indiscriminately destroyed personal property of those individuals without attempting to safeguard it in any way and without any determination as to whether those items specifically posed a threat to health and safety.

65.     The City indiscriminately destroyed personal property that it knew belonged to homeless individuals who were present during the City's May 19 camp closure and who did not have sufficient time to remove and safeguard all of their own belongings. The City took this action without any consideration as to whether those items specifically posed a threat to health and safety.

66.     The City's policy that it followed in closing the encampment at Stranahan Park on May 19 was a departure from its usual procedures, codified into City Code Section 16-83, "Outdoor storage on public property."

67.     City Code Section 16-83 sets out procedures for removal of personal property "stored" on public property.

68.     City police officers and city officials were aware of the encampment and had used the procedures in City Code Section 16-83 to provide advance notice to remove and store personal property from the area on prior occasions.

69.     City Code Section 16-83(a)(5) defines "store" as "any action to place, leave, park, locate, or set an item upon the public property at a distance in excess of twenty (20) feet from the occupant."

70.     Occupant means "the owner of, or any person in actual or apparent control of any property stored upon public property." Sec. 16-83(a)(1), City Code.

71.     The City's ordinance allows the City to remove personal property unlawfully "stored" on public property in violation of this section within twenty-four (24) hours after serving the "occupant" with written notice. Sec. 16-83(c)(1), City Code. The City's ordinance requires the City to store the personal property at a facility where the owner of the items can claim and retrieve those items.

72.     The City's ordinance also allows the City to remove personal property when the City "determines the need for an area-wide cleanup." The City is required to post written notice in the area to be cleaned at least thirty-six (36) hours in advance of the cleaning. Any items left in the area when the clean-up begins may be immediately removed and stored by the City. Sec. 16-83(c)(3)(c).

73.     The ordinance waives the ordinance's prior notice requirement if "an officer determines personal property stored on public property is a threat to the health, safety or welfare of the public." Sec. 16-83(c)(2), City Code.

74.     The City's ordinance includes in its definition of a "threat to the health, safety or welfare of the public...an infestation of vermin, including rodents." Sec. 16-83 (c)(2), City Code.

75.     Even if there were a threat to health, safety or welfare raised by the Violation issued to the City, the Department of Health had given the City until June 16,

2017 to address the situation. The City had ample time to provide notice and to safeguard personal property of homeless individuals living at the encampment. There was no circumstance requiring the immediate destruction of the personal property of homeless individuals residing at the encampment at Stranahan Park.

76.     Regardless of whether advance notice is provided prior to removal of property, the exception in Section 16-83(c)(2) still requires the City to store the property that it removes under this provision.

77.     Despite the storage requirement in the ordinance, the City only attempted to store property for individuals who happened to be present during the City's action on May 19 and only for the items those individuals were able to retrieve within the short time allowed. For individuals not present during the afternoon of May 19, the City did not make any efforts to store their property.

78.     The City must post notice "at the location where the personal property was removed which identifies the determined threat to the health, safety, or welfare of the public and the location to which the personal property has been taken." Sec. 16-83(c)(2), City Code.

79.     The City never posted the notice required by the ordinance.

80.     The ordinance mandates that the City may not dispose of items that it removes until 30 days after removal from public property, or seven days "if the items are deemed to be a threat to the health, safety, or welfare of the public" pursuant to the ordinance. Sec. 16-83(c)(4), City Code.

81.     There is no provision in the City's ordinance that authorizes the seizure and immediate destruction of personal property under any circumstances.

12

82.    The City removed and destroyed personal items belonging to homeless individuals arbitrarily and without making any determination as to whether a particular item of property itself constituted a threat to the health, safety, or welfare of the public.

83.    The City destroyed items that were not listed in the health department citation and which could not be considered as providing "harborage" for rats including personal documents, photos, reading glasses, bicycles, and medications.

84.    The City's actions taken on May 19, 2017 at Stranahan Park were authorized and ordered by City Manager Lee Feldman.

85.    City Manager Lee Feldman was present at Stranahan Park while City workers and police officers carried out his orders.

86.    Mayor Jack Seiler, and a majority of the City Commission, approved of the actions taken by City Manager Lee Feldman on May 19, 2017 at Stranahan Park.

87.    The City officials and employees acted under color of law when they seized and destroyed the belongings of homeless individuals at Stranahan Park.

**City's Seizure & Destruction of Plaintiffs' Property**

88.    ANTHONY STONE had been living at the homeless encampment next to Stranahan Park for approximately two (2) months.

89.    On Friday, May 19, 2017, Mr. Stone left the encampment to check his mail, leaving his personal belongings at the encampment.

90.    Stone arrived at the encampment on May 19 after the City had already destroyed his personal belongings. He lost all that he owned—four bags of clothing, mail, family photos, his grandmother's jewelry, and his reading glasses.

91.     Stone was not able to carry away or salvage any of his belongings. The only personal property he has left is what he was wearing and what he carried with him that day.

92.     Stone had no notice that the City would remove and destroy his property. The City made no attempt to save items that belonged to him, and it made no provision for him to claim his property after it had been seized. Instead, the City irrevocably seized Stone's property by destroying it.

93.     JAMIRA HAWTHORNE had been residing at the Stranahan Park encampment for more than five (5) months prior to May 2017.

94.     On Friday, May 19, 2017, Hawthorne was at a medical appointment when City officials arrived at the encampment that afternoon.

95.     She heard about the City's actions at the encampment because another individual called to inform her.

96.     Another resident at the encampment was able to save some of her clothes, shoes, and hygiene products.

97.     The City seized and destroyed all of Hawthorne's remaining belongings, including a folding chair, broom and dustpan, tarp, airbed, blankets, and pillows.

98.     Hawthorne had no notice that the City would remove and destroy her property. The City made no attempt to save items that belonged to Hawthorne and it made no provision for her to claim her property after it had been seized. Instead, the City irrevocably seized Hawthorne's property by destroying it.

99.     MICHELLE KONDERS resided at the Stranahan Park encampment for the six (6) months prior to May 2017.

100.    On Friday, May 19, 2017, Konders was in the Broward County Library when City officials arrived at the encampment that afternoon.

101.    Konders heard about the City's action at Stranahan Park from a fellow resident.

102.    When Konders arrived at Stranahan Park, she witnessed City employees and police throwing personal belongings of homeless persons into a dump truck.

103.    When Konders arrived, her personal belongings had already been destroyed by the City. She lost all of her belongings from the encampment—clothing, shoes, and a purse.

104.    Konders was not able to carry away or salvage any of her belongings. The only personal property she had left is what she was wearing and what she carried with her that day.

105.    Konders had no notice that the City would remove and destroy her property. The City made no attempt to save items that belonged to her and it made no provision for her to claim her property after it had been seized. Instead, the City irrevocably seized Konders's property by destroying it.

106.    NICK PHILISTINE resided at the Stranahan Park encampment for six (6) months prior to May 2017.

107.    On Friday, May 19, 2017, Philistine was present at the encampment when the police arrived in the afternoon.

108.    Philistine observed City workers clearing the area and throwing people's personal possessions into the trash.

109.   Homeless individuals who were present at the time of the City's action, including Philistine, were instructed to gather belongings to place in a blue bin that the City would remove and store.

110.   Philistine was only given a short amount of time to collect belongings and was able to save some of his clothing by placing it in one of the blue bins. City workers threw the rest of his clothing and two bicycles in a dump truck.

111.   Philistine had no notice that the City would remove and destroy his property. The City did not provide him with sufficient time to safeguard and remove his property prior to destroying it. The City irrevocably seized Philistine's property by destroying it.

112.   GUERLINE SALOMON resided at the homeless encampment next to Stranahan Park for approximately one (1) year prior to May 2017.

113.   On Friday, May 19, 2017, Salomon was in the Broward County Library when the police arrived at the encampment that afternoon.

114.   When Salomon left the library, she observed City employees and City police using heavy machinery to throw away and remove items from the encampment.

115.   Salomon tried to save some of her personal belongings before they were destroyed but was unable to do so. She was only able to save some items of clothing and shoes before the rest of her items were destroyed, which included shoes, clothes, bedding, personal documents, and stuffed animals.

116.   Salomon attempted to retrieve her property but City workers informed her that they had already thrown her belongings in the trash.

117.    Salomon had no notice that the City would remove and destroy her property. The City did not provide her with sufficient time to safeguard and remove her property prior to destroying it. The City irrevocably seized Salomon's property by destroying it.

118.    ANA BATISTA resided at the homeless encampment next to Stranahan Park for approximately three (3) weeks prior to May 2017.

119.    On Friday, May 19, 2017, Batista was at Stranahan Park when City officials arrived at the encampment.

120.    Batista observed City workers throwing away people's personal belongings and telling everyone to leave the area.

121.    Batista attempted to retrieve her belongings from the City police station on May 22, 2017. None of her belongings were stored by the City, which included pillows and some jewelry. The City irrevocably seized this property by failing to store it and safeguard it in a manner that allowed her to retrieve it.

122.    Batista had no notice that the City would remove and destroy her property. The City did not provide her with sufficient time to safeguard and remove her property prior to destroying it. The City irrevocably seized Batista's property by destroying it.

123.    DEMOND MINER resided at the homeless encampment next to Stranahan Park for approximately one (1) month.

124.    Miner was away from the encampment looking for a job when the police arrived in the afternoon of May 19.

125.    When Miner returned to the encampment, his belongings were gone which included a bag, clothes, shoes, hygiene products, and family jewelry.

126.   Miner had no notice that the City would remove and destroy his property. The City made no attempt to save items that belonged to him and it made no provision for him to claim his property after it had been seized. Instead, the City irrevocably seized Miner's property by destroying it.

127.   ERIC TOWNSEND resided at Stranahan Park for approximately five (5) months prior to May 2017.

128.   On May 19, 2017, Townsend was at work doing landscaping when the City's action took place at Stranahan Park.

129.   When Townsend returned to Stranahan Park, he saw his belongings in a pile but the police did not allow him to retrieve the items.

130.   The City destroyed all of Townsend's belongings. He lost all of his belongings from the encampment—a pair of work boots, clothing, personal documents including identification, a birth certificate, social security card, cell phone, book bag, and personal hygiene products.

131.   Townsend had no notice that the City would remove and destroy his property. The City made no attempt to save items that belonged to him, and it made no provision for him to claim his property after it had been seized. Instead, the City irrevocably seized Townsend's property by destroying it.

132.   JENNIFER DODGE resided at Stranahan Park for approximately four (4) months prior to May 2017.

133.   On May 19, 2017, Dodge was at the encampment when City officials arrived with heavy machinery and police officers.

134.   Dodge observed City workers bulldoze people's belongings while individuals who were there were trying to grab everything they could.

135.   Dodge was only able to grab some clothes, a small suitcase, blankets, and sheets before the City destroyed the rest of her belongings. Dodge did not have enough time to save all of her belongings. The City destroyed her personal property that she kept with her at the encampment including clothes, shoes, a sleeping cot, tent, and a tablet.

136.   Dodge had no notice that the City would remove and destroy her property. The City did not provide her with sufficient time to safeguard and remove her property prior to destroying it. The City irrevocably seized Dodge's property by destroying it.

137.   JOHNATHAN LAMBERT resided at Stranahan Park for approximately five (5) months before May 2017.

138.   Lambert was at school in Plantation when the police and City officials arrived at the encampment on May 19.

139.   When Lambert arrived back at the encampment, she saw her belongings in a pile, but the police did not allow her to retrieve the items. She was threatened with arrest if she tried to retrieve her belongings.

140.   The City destroyed all of Lambert's personal property that she kept with her at the encampment, including school supplies for cosmetology school, personal documents including identification card and social security card, clothes, shoes, cell phone, blankets, pillows, and medication.

141.   Lambert had no notice that the City would remove and destroy her property. The City made no attempt to save items that belonged to her, and it made no

provision for her to claim her property after it had been seized. Instead, the City irrevocably seized Lambert's property by destroying it.

142.   KEVIN RICE resided at the homeless encampment at Stranahan Park on or around May 19, 2017.

143.   Rice was not present at Stranahan Park when the City initiated its action on May 19.

144.   When Rice returned to the encampment he saw that everything was gone, including his personal belongings.

145.   Rice asked a City police officer where his belongings were. Rice was informed that the City took his belongings and disposed of them in a dump truck. The police officer informed Rice that nothing could be done about it and his personal items were not recoverable.

146.   The City destroyed all of Rice's personal property that he kept at the encampment, including clothes, personal hygiene products, personal documents including a birth certificate, social security card, copies of his resume, a phone charger, and his inhaler.

147.   Rice had no notice that the City would seize and destroy his property. The City made no attempt to save items that belonged to him and it made no provision for him to claim his property after it had been seized. Instead, the City irrevocably seized Rice's property by destroying it.

148.   LISA ROBINSON resided at the encampment next to Stranahan Park since February 2017.

20

149.   On May 19, 2017, Robinson was at the Broward County library when the police arrived in the afternoon to the encampment at Stranahan Park.

150.   Robinson saw what was happening at the encampment by looking out the window at the library. She left the library immediately and went to the encampment.

151.   When Robinson arrived, she saw City workers clearing the area and throwing people's possessions away.

152.   Robinson was able to grab some of her personal items (including some clothing, blankets, and pillows) to place them in blue storage bins provided by the City.

153.   All of Robinson's other belongings—clothing, paperwork, and her medications—were disposed of by the police and other City workers.

154.   Robinson had no notice that the City would remove and destroy her property. The City did not provide her with sufficient time to safeguard and remove her property prior to destroying it. The City irrevocably seized Robinson's property by destroying it.

155.   SABRINA HOLMES resided at the encampment next to Stranahan Park for five (5) months prior to May 2017.

156.   On May 19, Holmes was at the encampment when City officials arrived that afternoon.

157.   Holmes observed City officials taking people's property and throwing people's possession's away.

158.   Holmes tried to save her property but was only able to save a purse and a bag.  Everything else she owned, including her laptop, phone, clothes, shoes, personal hygiene products, purses, family photos and other family items were thrown away.

159.  Holmes had no notice that the City would remove and destroy her property. The City did not provide her with sufficient time to safeguard and remove her property prior to destroying it. The City irrevocably seized Holmes' property by destroying it.

160.  MANFRED ZAEPERNICK resided at the encampment next to Stranahan Park for five (5) months prior to May 2017.

161.  On May 19, Zaepernick was at the encampment when City officials arrived that afternoon.

162.  Zaepernick was initially told by City workers that he had 45 minutes to remove his belongings, but the City workers immediately started collecting and picking up items and throwing them away.

163.  Zaepernick was only able to grab some of his clothing before the City seized and destroyed the rest of his personal belongings, which included my heart medications, a tarp, a hammer, sanitizer, and a cross pen.

164.  Zaepernick had no notice that the City would remove and destroy his property. The City did not provide him with sufficient time to safeguard and remove his property prior to destroying it. The City irrevocably seized Zaepernick's property by destroying it.

165.  NANCY HOWELLS-GRANT resided at or near the encampment at Stranahan Park for approximately one (1) year prior to May 2017.

166.  Howells-Grant was at church when the police arrived in the afternoon of May 19, 2017.

167.   Howells-Grant returned to the encampment to find all of her belongings were gone and there were "no trespassing" signs posted near where the encampment was located.

168.   Howells-Grant's personal property was taken and disposed of by the City, including clothing, personal documents, a laptop, books, jewelry, paintings, and various antique items.

169.   Howells-Grant had no notice that the City would seize and destroy her property. The City made no attempt to save items that belonged to her and it made no provision for her to claim her property after it had been seized. Instead, the City irrevocably seized Howells-Grant's property by destroying it.

170.   RAYMOND SMITH resided at the encampment near Stranahan Park since February 2017.

171.   On May 19, 2017, Smith was sitting on the wall next to Stranahan Park when the police and City workers arrived in the afternoon.

172.   Smith observed City workers clearing the area and throwing homeless people's possessions into the trash.

173.   Smith was given just a few minutes to gather his belongings. He was able to save two of his bags of clothes and put his pillows and blankets in a bin that was to be taken and stored by the City.

174.   Smith did not have enough time to save all of his belongings. The City destroyed his personal property that he kept with him at the encampment including his birth certificate, legal documents, shoes, and medication.

175.   Smith had no notice that the City would remove and destroy his property. The City did not provide him with sufficient time to safeguard and remove his property prior to destroying it. The City irrevocably seized Smith's property by destroying it.

176.   Many of the Plaintiffs have returned to the area around Stranahan Park with personal property and are at risk of future confiscation and destruction of their property by the City.

**First Claim for Relief**
**Denial of Constitutional Right against Unreasonable Seizure**
**United States Constitution, Fourth Amendment**

177.   Plaintiffs incorporate and re-allege by reference paragraphs 1-176 as if fully set forth here.

178.   Plaintiffs have a right to be free from unreasonable seizures under the Fourth Amendment to the United States Constitution.

179.   Plaintiffs had a clearly established possessory interest in their personal property, and that interest is reasonable and legitimate.

180.   By seizing and completely destroying Plaintiffs' property, Defendant meaningfully interfered with Plaintiffs' possessory interests and seized Plaintiffs' property in violation of the Fourth Amendment.

181.   Defendant acted under color of law in destroying Plaintiffs' property.

182.   Defendant's above-described policies, practices and conduct violate Plaintiffs' right to be free from unreasonable seizures under the Fourth Amendment to the United States Constitution.

183.   Plaintiffs have suffered and continue to suffer irreparable harm for which there is no adequate remedy and law and they have been directly damaged as a result of the City's conduct.

**Second Claim for Relief**
**Denial of Constitutional Right to Due Process of Law**
**United States Constitution, Fourteenth Amendment**

184.   Plaintiffs incorporate and re-allege by reference paragraphs 1-176 as if fully set forth here.

185.   Plaintiffs have a constitutionally protected interest in their personal property.

186.   Defendant seized and destroyed Plaintiffs' personal property with no notice, or with constitutionally inadequate notice.

187.   Defendant seized and destroyed Plaintiffs' personal property without providing a meaningful opportunity for Plaintiffs to challenge the deprivation of property.

188.   Defendant irrevocably deprived Plaintiffs of their personal property by destroying it without constitutionally adequate due process.

189.   Defendant acted under color of law in destroying Plaintiffs' property.

190.   Defendant's above-described policies, practices and conduct violate Plaintiffs' right to due process of law under the Fourteenth Amendment to the United States Constitution.

191.   Plaintiffs have suffered and continue to suffer irreparable harm for which there is no adequate remedy and law and they have been directly damaged as a result of the City's conduct.

## Jury Demand

Plaintiffs demand a jury trial on all issues so triable.

## Prayer for Relief

**WHEREFORE**, Plaintiffs seek relief from this Court as follows:

1.   Injunctive relief enjoining Defendant from repeating the unlawful policies, practices, and conduct, specifically that Defendant be enjoined from any future confiscation and destruction of Plaintiffs' property absent a lawful justification accompanied by proper notice and other due process protections;

2.   Declaratory judgment that Defendant's policies, practices and conduct violated Plaintiffs' rights under the Fourth and Fourteenth Amendments of the United States Constitution;

3.   Damages in an amount according to proof;

4.   Attorneys' fees and costs as provided by law; and

5.   Such other and further relief as the Court may deem just and proper.


June 19, 2017                            Respectfully submitted,


                                          s/ *Jacqueline Nicole Azis*
                                         Jacqueline Nicole Azis, Fla. Bar No. 101057
                                         jazis@aclufl.org
                                         Nancy Abudu, Fla. Bar No. 111881
                                         nabudu@aclufl.org
                                         ACLU FOUNDATION OF FLORIDA
                                         4343 W Flagler Street
                                         Suite 400
                                         Miami, Florida 33134
                                         786-363-2700

Kirsten Anderson, Fla. Bar No. 17179
Kirsten.anderson@southernlegal.org
Jodi Siegel, Fla. Bar. No. 511617
Jodi.siegel@southernlegal.org
SOUTHERN LEGAL COUNSEL
1229 NW 12th Ave.
Gainesville, FL 32601
352-271-8890

ATTORNEYS FOR PLAINTIFFS